THE FIRST NATIONAL BANK OF ENID V. E. E. YEOMAN.

(Filed September 3, 1904.)

1. **MEMORANDA—Used to Refresh Memory, When—Admitted in Evidence, When.** Written memoranda of subjects and events pertinent to the issues in a cause, made contemporaneously with their taking place, when shown by the oath of the person making them that they were known to be correct when made, may, when the memory of the witness is deficient, be referred to to refresh the memory of the witness, and when so used, if the witness is unable to state the facts so recorded, such memoranda may be introduced in evidence, not as independent proof, but to supply the details of what the witness has sworn to generally.

2. **SAME—Error to Admit, When.** When it is not shown that such memorandum was made contemporaneously with the happening of the events which it describes, and that the events were known to have been correctly recorded, it is error to admit such memorandum in evidence.

3. **CHATTEL MORTGAGE—Fraudulent Conveyance.** Where a mortgagee of chattels for the purpose of enforcing its lien, seizes the mortgaged chattels in the hands of a third person who claims to be the owner, and such third party sues to recover the value of the chattels so taken, and the mortgagee defends upon the ground that the mortgagor made a fraudulent transfer to such third party, and executed the mortgage before there was any change of possession, such mortgagee will be treated as an incumbrancer, and not as a creditor of the mortgagor, and must show that it became an incumbrancer in good faith subsequent to the fraudulent transfer.

(Syllabus by the Court.)

*Error from the District Court of Garfield County; before James K. Beauchamp, Trial Judge.*

*Wittinghill & Hubbell,* for plaintiff in error.

*Rush & Steen,* for defendant in error.

Opinion of the court by

BURFORD, C. J.: This was an action by E. E. Yeoman to recover the value of certain cattle alleged to have been

unlawfully taken and converted by the, defendant. It appears that the father of the plaintiff below, one A. J. Yeoman, borrowed twenty-five hundred dollars from the First National Bank of Enid, and to secure the bank, executed a mortgage upon certain cattle. The note was not paid and the agents of the bank went to the pasture of E. E. Yeoman, in Woods county, and by the assistance of an officer, and against the objections and protests of the defendant in error, forcibly took possession of the cattle in question, which cattle the defendant in error claimed as his individual property, and which the bank claimed as covered by its mortgage given by A. J. Yeoman. Issues were formed, and the cause tried to a jury, and verdict returned and judgment rendered in favor of the defendant in error for the sum of $2550.00, as the value of the cattle, it having been admitted by the bank that it had sold the cattle, and could not return them.

The plaintiff in error filed its motion for new trial, which was overruled, and now brings the case here for review.

The assignment of error that the trial court erred in overruling the motion for new trial embraces all the questions relied upon for a reversal of the judgment. The first alleged error is the admission in evidence over the objection of the defendant below of certain memoranda made by the plaintiff relating to certain transactions of his own, and not with the bank. One of the material questions on the trial of the cause was when and how the plaintiff became .the owner of the cattle in controversy. The mortgage was executed by A. J. Yeoman on September 4, 1901, and described 150 head of cows located at certain divers places

and of divers colors and ages, and "all branded 'Y' on the right hip." The plaintiff testified as a witness in his own behalf, and claimed all the cattle branded "Y" on the right hip were his cattle, and that his father never owned any cattle having such brand. It seemed that he had procured a number of these cattle from his father; that his father had bought some of them for him; that he bought some of them himself, and that his wife purchased some of them. Some were purchased before the execution of the bank's mortgage, and some afterwards; some of them had been in the pastures of Yeoman, sr., and some had not. The particular date of each purchase, the number purchased at each time, from whom purchased, and where the cattle were kept at certain dates, were material questions which arose upon the trial of the cause, and the plaintiff gave oral testimony on each of these several questions. During his examination it appears from the record that the following occurred:

By counsel for plaintiff:

"Q.    What is that book you have in your hand, Mr. Yeoman?

"A.    A note book, a book that I have been keeping accounts of stuff and things in.

"Q.    When were the entries in that book made, Mr. Yeoman?

"A.    Most all of them October 26, 1901.

"Q.    Were the entries made at that time or since that time?

"A.    Yes sir.

"Q.    At the time of the transaction?

"A.    Yes sir.

"Q.    These are the original entries of the movements of those cattle at that time?    Question not answered.

"Counsel for plaintiff at this time offers in evidence this book, and the same is here marked exhibit 'C.'

"Counsel for the defendant at the time objects as incompetent, irrelevant and immaterial, and not the best evidence, and only a self serving declaration.

"Objection overruled by the court, to which ruling the defendant at the time excepts."

The book was then submitted to the jury. The memoranda contained in the book appears in the record. It purports to be a statement of cattle purchased at various times, how paid for, notes executed, security given, where certain cattle were fed, where pastured, the number that died each year, the amount paid for feed and for pasture, the number of calves and increase, the brands, marks and various other matters not relevant to any issue involved in the trial of the case. The first date of a transaction entered in the book is Aug. 24, 1901, and the last entry is dated Sept. 12, 1902. This memorandum does not purport to be a book of account, or to contain items of account with the bank or with the elder Yeoman, but is a record of events, dates, numbers and marks made by the plaintiff for his own private use, and in his own interest. Was it error to admit this book in evidence? Our statute, civil code, sec. 4574, Wilson's Stat. 1903, provides: "Entries in books of account may be admitted in evidence when it is made to appear by the oath of the person who made the entries, that such entries are correct, and were made at or near the time of the transaction to which they relate, or upon proof of the hand-writing of the person who made the entries in case of his death or absence from the county." But this section has no application to a book of the character admitted in evidence in this cause. The statute refers to "books of account" and refers

to books only when they contain charges by one party against the other, or of dealings with him. (*Masters v. Marsh,* 9 Neb. 458; *Pollard v. Turner,* 22 Neb. 336; *Van Every v. Fitzgerald,* 21 Neb. 36). The question as to whether independent written memoranda of subjects and events, made by one of the parties to an action and without the knowledge or acquiescence of the adverse party, pertinent to the issues, made contemporaneously with their taking place, and supported by the oath of the person making them, are admissible in evidence for any other purpose than to refresh the memory of the witness, is one upon which courts and text writers are not harmonious. The supreme court of the United States in *Bates v. Preble,* 151 U. S. 149, had this question under consideration, and while conceding that there were respectable authorities upon either side of the proposition, and without rejecting the rule, contented itself by declaring that the court had not committed itself on the general rule, that such memoranda were admissible for any other purpose than to refresh the memory of the witness. The trend of adjudications seems to favor a more liberal application of the rule, and we think it may safely be said that the rule upon this question is, that written memoranda made by one in the regular course of business transactions, and made contemporaneously with their taking place, when supported by the oath of the person making them are, when required and used to refresh the memory of the witness, admissible in evidence, and may go to the jury, not as independent evidence of the facts therein stated, but to supply the deficient memory of the witness. While some of the courts have even gone farther, and admitted the memorandum as independent proof, it has generally been in cases

where the memorandum was made by one not a party to the
action, or by one whose testimony could not be obtained by
reason of death or other cause. But in any case, before this
class of evidence can be admitted, it must be shown by the
witness whose memory is to be refreshed that the memoran-
dum was made by himself at the time of the transaction con-
cerning which he is questioned, or so soon thereafter that
it is apparent that the transaction was fresh in his mind,
and that he knew it to be correct when he made it. If then
after referring to the memorandum the witness is unable to
recall the facts without the aid of it, it may be introduced
and read in evidence, not as independent proof, but as evi-
dence of what the witness testified from it. (Abbott's Trial
Evidence, [2nd Ed.], pp. 395-396).

In the case under consideration it may be inferred that
Yeoman made the entries in the book himself, but there is
no evidence to that effect; there is no evidence that the events
or transactions contained in the book were correctly record-
ed; there is no evidence that he knew them to be correct
at the time they were made, and the evidence as to when
they were made was uncertain and unsatisfactory. He first
answered positively that most of the entries were made Oct.
26, 1901, and again says that they were made at the time
of the transaction. We think the court erred in admitting
this memorandum. It was not competent until it was made
to appear by preliminary and satisfactory proof that this
memorandum was not manufactured for the purposes of this
trial, and that it was a correct record of events or transac-
tions made at the time they occurred, and related only to
the matters at issue in the case. There are matters record-
ed in this memorandum that are not pertinent to the question

of the ownership of the cattle on Sept. 4, 1901, or as to where they were located at that time, nor to the question as to when and where the plaintiff obtained the cattle he was claiming in this action.

In the case of *Bates v. Preble, supra,* it was held that if a memorandum made in a book contains other matter which is not proper for submission to the jury, the leaves containing the inadmissible matter should not go to the jury, and that it is not sufficient to direct the jury not to consider the objectionable matter. We would suggest further that it is questionable whether the witness showed such a want of recollection on the questions submitted to him as entitled him to look to any memoranda for the purpose of refreshing his memory.

The next question presented for our consideration is that the wife of the plaintiff was permitted to testify on behalf of her husband, over the objection of the defendant, without first showing that in the matters about which she was offered as a witness she was acting as the agent of her husband. The competency of a witness is one primarily and originally for the determination of the court, and when the competency of a witness is objected to upon any proper grounds, the court should ordinarily hear the preliminary proof, and determine the competency of the witness before permitting the witness to give testimony upon the merits of the case. But this is a matter of order of proof or of procedure, and if upon the whole testimony it appears that the witness was competent to testify, or to give the testimony introduced, then there is no available error committed.

In this case the wife was permitted to and did testify without her competency first being shown, but it clearly ap-

peared that in all the matters she testified concerning, she was acting as agent for her husband, and this being the case she was a competent witness, and if any error was committed, it was cured.

On the trial of the cause the defendant requested the court to give the following instruction, which was refused and exception saved: "The jury are instructed that if they find that A. J. Yeoman had possession or control of the cattle claimed by the plaintiff at the time plaintiff says they were sold to him by A. J. Yeoman, and that such sale, if there was one, was not accompanied by an immediate delivery and followed by an actual and continued change of possession of the cattle, then you must treat said sale as fraudulent and void as against the defendant herein, if you find that defendant was at the time of said alleged sale a creditor of said A. J. Yeoman." The request for this instruction was based upon sec. 2663, Statutes of Oklahoma, 1893, which provides: "Every transfer of personal property other than a thing in action * * * is conclusively presumed, if made by a person having at the time the possession or control of the property and not accompanied by an immediate delivery and followed by an actual and continued change of possession of the things transferred, to be fraudulent, and therefore void against those who are his creditors while he remains in possession, * * * and against purchasers or incumbrancers in good faith subsequent to the transfer." The instruction requested was properly refused. It did not state the law as applicable to the particular facts involved; it would have been misleading and confusing to the jury. The bank was not claiming the cattle as a creditor of A. J. Yeoman, but as an incumbrancer,

and an incumbrancer is one who has a lien upon specific property. The bank took these cattle by virtue of a mortgage executed by A. J. Yeoman, and it was defending this action upon the ground that it secured a lien upon these specific cattle by the execution of said mortgage, and that it had the right to take and hold possession of the cattle for the purpose of enforcing the mortgage lien. The rule as to the rights of an incumbrancer is different from that which governs the rights of a creditor. If the bank had been seeking to enforce an attachment or execution against the cattle, the instruction requested would have been proper, but it did not state the law as applicable to the theory upon which the bank relied. It is not always the case that an abstract proposition of law, correct in principle, may be safely given to a jury. The law must be correct as applied to the particular facts in issue, and in this case, unless the bank could show that it was an incumbrancer in good faith subsequent to the transfer of any of the cattle in dispute from A. J. Yeoman to E. E. Yeoman, and while A. J. Yeoman remained in possession of such cattle, then the statute in question would have no application. The court gave the law generally as contained in the statute, but should have eliminated that portion of it which was inapplicable to the case as made by the evidence.

It is also contended that Yeoman was estopped from setting up any claim to these cattle as against the bank, upon the ground that he and his father had subsequently borrowed money from the bank and rendered a property statement in which it appeared that these cattle claimed by E. E. Yeoman had been mortgaged to the bank previously by A. J. Yeoman, and that he failed at that time to make any claim

of ownership. We are unable to see how any element of estoppel enters into this transaction. There was nothing loaned or no consideration passed at that time upon the strength of the ownership or *status* of these cattle; that loan was made and security taken upon certain specific chattels, of which these cattle composed no part. Nor is the bank making any claim as a general creditor to A. J. Yeoman. As before stated, they assert the right to hold these cattle by virtue of a specific lien created by A. J. Yeoman, and not by E. E. Yeoman, and they must stand or fall by this chattel mortgage, and there is no claim that E. E. Yeoman ever made any statements or representations to them prior to the time this mortgage was executed, and so long as the bank advanced nothing in this transaction, or did not change their position to their own detriment as fixed by the mortgage under which they claim, these subsequent transactions are irrelevant.

The real and controlling question in this case is, did A. J. Yeoman ever own any of the cattle taken by the bank from E. E. Yeoman under the mortgage executed by A. J. Yeoman on September 4, 1901? If he had owned any of the cattle prior to that time, and had or had not sold or transferred them to his son, and they still remained in his pasture or on his farm under his control or in his possession until the time the bank took the mortgage, and the bank had no notice of any transfer to the son, then it can enforce its mortgage as against all such cattle. Or, if A. J. Yeoman owned any of the cattle at the time the mortgage was executed, and afterwards sold or transferred them to his son, then the mortgage will hold all such cattle. But if any of these cattle were purchased by E. E. Yeoman from other

parties either before or subsequent to the execution of the mortgage under which the bank claims, then he should have judgment for the value of any such cattle. The evidence and instructions should be specifically confined to these three propositions, and to such issues as incidentally arise, and the case determined accordingly.

There is but one other question argued which we need notice. It is contended that the plaintiff was permitted to testify as to the value of the cattle without showing his qualifications. We think it sufficiently appeared that he was a farmer and stock dealer, and was engaged in buying and selling cattle, and had been for some time previously. This made him competent. It was not a question that required expert or skilled knowledge, but general knowledge, and he possessed it sufficiently upon that question.

The judgment of the district court of Garfield county is reversed, and cause remanded with directions to grant a new trial, and proceed in accordance with the views herein expressed. Reversed at the costs of defendant in error.

Beauchamp, J., who presided in the court below, not sitting; all the other Justices concurring.